UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORIO TORRES,<br><br>    Petitioner,<br><br>    v.<br><br>J. BROWN, warden,<br><br>    Respondent.<br>_____ / | No. C 04-2915 SI (pr)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

**INTRODUCTION**

Gregorio Torres seeks a writ of habeas corpus under 28 U.S.C. § 2254. For the reasons set forth below, the petition for a writ of habeas corpus is denied.

**BACKGROUND**

A.    <u>The Crimes</u>

Torres' conviction stems from incidents on two different days when he allegedly sexually assaulted his 6-year old son. The evidence of the crime was described in the California Court of Appeal's opinion. That court's lengthy description of the family circumstances and the crimes are repeated here because most of Torres' claims pertain to his defense theory that the charges were fabricated by his ex-wife who used their son as a pawn to make the charges and ruin her ex-husband's life.

Manuela Esparza testified that defendant [Torres] was her former husband and together they had a son, J. [Javier], who was born in January of 1992. For about four to five months during 1998, the three of them lived together in a rented room in a house on Mastic in San Jose. Subsequent to the Mastic house, they lived in a rented room in a house on Alma in San Jose. Esparza testified that the last time she had lived with defendant was January 1, 1999.

Esparza recalled that, when J. was six years old, he developed a rash on his feet and hands and she took him to the doctor. She was given some cream and it was her job to apply the cream to J.'s rash. She indicated that J did not have a rash or other problem on his bottom or genital area while they were living with defendant.

Esparza testified that her son had told her that "his father had stuck his penis in his anus." J. told her this information when she and J. were living with her brothers. Esparza testified that in January 2000, which she first said was about two or three months after J. had revealed he had been sodomized, she took J. to a doctor and the doctor reported it to police. Esparza explained the delay occurred because she did not have any insurance for J., did not have the money to pay for the visit, and had not paid an earlier doctor's bill. Later at trial, she indicated that J. had told her about being sodomized earlier than she had previously testified and she had already known that information when she returned to get her mail from the Alma house sometime around mid-1999. At that time, she had told Avelino, from who they had rented the room in the Alma house, that defendant had abused J.

Esparza recalled that, when the three of them lived together, she normally worked 8:00 a.m. to 4:30 p.m. on weekdays and 9 a.m. to 5:30 p.m. on Saturdays. Defendant worked from about 6:00 p.m. to 2:00 a.m. Defendant took care of J. while Esparza was working.

Esparza admitted to being very upset or angry with defendant for past domestic violence problems, for making her take care of his daughter by another woman, for giving that daughter things she wanted while impliedly denying things to J. and for what he had done to J. Esparza testified that defendant had hit her "[l]ots of times" and had been arrested twice for hitting her. She stated that J. saw defendant hit her and was scared. Defendant also spanked J. and hit J. with a belt.

J. testified through a Spanish interpreter that, at the time of trial in February 2001, he was nine years old. He identified defendant as his father. When asked if his father ever did anything to him that he did not like, J. testified that defendant put "his pee-pee in [J.'s] pompis" and that it happened "[m]ore than one time." J. indicated that it happened during the day in the room where he lived with his mother and father at the house on Mastic while his mother was working and not at home.

Although J. responded "I forget" to many questions, he recalled that the first time it happened he was lying down on his belly. He testified that his father took off J's clothes at some point and, when his father put his pee-pee in his pompis, it felt bad and hurt. J. testified that he tried to get away from his father. J. recalled that, after his father put in his pee-pee, his father put his finger which had cream on it, "inside the part of [his] pompis where [he goes] pooh-pooh from." He remembered that it felt bad and hurt but it hurt more when he put in his "pee-pee." J. indicated that he told his father not to do it when it hurt but his father did not stop.

According to J., after the incident, his father threatened him by saying he would kill J.'s mom if he told anybody and this threat scared him and so J. did not tell anybody. J indicated that he had previously seen his father hit his mother, which had scared him.

2

J. testified that a second incident occurred during the day in their room at the same house when his mother was working and not at home. His father again took off J.'s clothes. J. stated his father was on the floor with him. J. indicated that his father again put his "pee-pee" inside the part of J.'s "pompis" from which J. went "pooh-pooh" and it felt bad and hurt. J. testified that his father was on top of him and he could not get away because his father was heavy. He indicated that his father again put his fingers, with cream, inside the part of his "pompis" from which he goes "pooh-pooh."

J. was asked, "when your father was doing this to you, putting his pee-pee in your pompis, do you remember ever screaming?" J. answered, "Yes." When then asked what his father did when he screamed, J. responded, "He got off of me because the police was coming." According to J., his father sent him to the bathroom while the police were there and the police "checked out the house and then they left." J. testified that his father told him not to tell anybody. J. remembered telling Detective Morales that his father threatened to cut out his tongue if he ever told and confirmed that his father said that the second time. J. also testified that he remembered telling the detective that on some occasion he had stuck out his tongue at defendant and defendant threatened to cut off his tongue if J. stuck out his tongue again.

J. testified that the last time he lived with his father was before his father was taken away by police. This occurred when his father hit his mother and his mother called the police. After they moved to his uncle's home, J. told his mother what his father had done. He told his mom because he knew his dad was in jail and could not hurt him.

On cross-examination, J. indicated that he remembered he had previously said the incidents occurred at the house on Alma Street but on redirect examination evidence came out that J. had testified the first time without being shown pictures of the houses where he had lived and he had been thinking of the Mastic house when he spoke to Detective Morales and when he testified at the preliminary hearing. J. also stated that defendant "pushed" his "pee-pee" into his pompis.

Linda Cook, who worked in the crime analysis unit of the San Jose Police Department, testified regarding a record of a 911 call from the Mastic Street residence that was received at 4:40 p.m. by the San Jose Police Department on July 11, 1998. The records indicate that an officer was dispatched, he arrived at 4:43 p.m., and the call was cleared at 4:47 p.m. as "unfounded." The records did not show any other dispatch call in 1998 to the Mastic address.

Erick Enderle, a San Jose police detective, testified that he interviewed defendant on May 10, 2000. He recalled asking defendant if he had ever touched his child in an inappropriate manner. Enderle testified that defendant initially became quiet and appeared nervous. He was silent for a few moments and then defendant said, "'If you think I'm guilty, then I'm guilty.'" According to Enderle, after another brief pause, defendant stated "'I did it.'" Defendant indicated that it had occurred on an unknown date in 1998 and recalled that he had been lying in bed with the victim and he "had to apply a lotion or cream of some sort to the victim's buttocks area due to a rash that the victim had." According to Enderle, defendant had admitted that "after he applied the cream, that he placed his [penis] into the victim's butt." Enderle testified that defendant had said that the child screamed, he then stopped, and they both went to sleep. Enderle also testified that defendant had admitted to lowering the child's underwear and having an erection.

Carl Lewis, a criminal investigator for the District Attorney's office, testified that he met with J. on December 29, 2000 for the purpose of identifying the location of the reported incidents. After Lewis took J. to the general area, J. pointed out the house on Alma and then directed Lewis to the house on Mastic Street. J. told Lewis that the two

3

incidents with his father occurred at the house on Mastic Street.

Leticia Ordaz testified that she began living with defendant during 1994 while his wife was living in Mexico and together they had a little girl, C., who was five at the time of trial in February 2001. According to Ordaz, they stopped living together in 1996. She indicated that defendant continued to see his daughter after they separated and would pick up C. from Ordaz's home as many as three days a week. She recalled that J. appeared happy when defendant brought him to her home and, during 1998, J. appeared to be happy around his father.

Ordaz testified that Esparza telephoned Ordaz's sister-in-law's house. Esparza told Ordaz's sister-in-law that defendant had suffered an accident and Ordaz testified that she had run to answer the call. Esparza then asked Ordaz where defendant was. Ordaz stated that Esparza was aggressive and used bad words. The court sustained a hearsay objection when defense counsel asked Ordaz to relate the particular words. Ordaz also testified that Esparza had made threats toward her daughter. After eliciting testimony that Ordaz felt uncomfortable because of threats made toward her daughter, defense counsel asked whether Esparza had made the threats. Ordaz replied, "Saying that something was going to happen to my little girl." The court sustained a nonspecific objection to Ordaz's nonresponsive answer.

Maria Montenegro, defendant's sister, testified that she had lived with defendant and Esparza during 1997 and had stayed there about a year. Montenegro indicated that defendant's relationship with J. was "good." She stated that J. "would always follow [defendant] more than he would follow [Esparza]."

Montenegro recalled that Esparza was "obsessed" with defendant and was concerned he was with Ordaz whenever he went out. According to Montenegro, Esparza would "dedicate" herself to looking for defendant or call defendant on his beeper. Montenegro indicated that Esparza would sometimes just disappear and leave J. in the house with her. At one point during Montenegro's testimony, she stated that Esparza "used to say my brother was with Leticia [Ordaz]" when defendant was not there. The court sustained a hearsay objection.

Montenegro recalled an occasion when Esparza's bothers came to the house and were waiting for defendant to arrive. When she testified that Esparza "called her brothers because she wanted her brothers to go out and look for my brother and beat him up," the court sustained a "speculative" objection and told the jury to disregard Montenegro's testimony. When she testified that Esparza told her that the brothers were looking for defendant, the court sustained a "hearsay" objection and told the jury to disregard Montenegro's testimony.

Montenegro testified that Esparza treated J. "very badly" and "[t]here were times when she would hit him or would say ugly things to him." Esparza would call J. "lazy" and say "he was a beggar and lazy like his father . . . she didn't want to see him." According to Montenegro, when defendant was not at home, Esparza "would always mistreat the child and would hit him," "[s]he wouldn't tend to him," and "[s]he wouldn't feed him."

Montenegro testified that J. "was always say[ing] that he was going to go eat because her [*sic*] mother would never give her [*sic*] food." The court sustained a hearsay objection and told the jury to disregard the testimony. The court also sustained a hearsay objection to her testimony indicating that, once after J. had come out of the bath, J. asked Esparza, "'Give me my clothes, Mommy.'" Montenegro testified without objection that Esparza "always had a bad reaction with everything [J.] would ask her, especially when [defendant] was present." Montenegro testified that Esparza would make derogatory remarks toward

4

J. and use curse words. However, the court sustained a hearsay objection and directed Montenegro not to answer when she was asked to repeat the curse words in court.

Montenegro testified that, during 1998, defendant would bring J., for whom he was caring, to her house. Sometimes defendant would also bring C., defendant's and Ordaz's daughter. Montenegro was able to observe defendant, J. and C., interacting and socializing.

Montenegro stated she was aware that there were problems of domestic violence between Esparza and defendant and defendant had gone to jail for striking Esparza. She indicated that she had lived with defendant and Ordaz when she, Montenegro, came to the United States from Mexico and she had not seen any domestic violence between defendant and Ordaz.

Montenegro was asked whether she remembered receiving a telephone call from J. in 1998 during which he said that his mother, Esparza, had hit him because he refused to telephone Ordaz and she answered affirmatively. The People then objected on the grounds of hearsay and the court sustained the objection.

Defendant testified he moved with Esparza and J. to Mastic Street in April of 1998 and lived there for about four months. He then moved with them to West Alma. Defendant recalled that he worked nights and Esparza worked days during the period they lived in the houses on Mastic and Alma. He took care of J. while Esparza was at work.

Defendant testified at one point that he "would spend most of the day with Leticia," with whom he admitted having a relationship while Esparza was in Mexico. He indicated that during the day he would be at Leticia's house with J. and C. He also testified at another point that he slept at home all day and J. played on the patio. He indicated that sometimes he would leave the kids with his sister and go with his friends to play football.

Defendant acknowledged he and Esparza got into a lot of arguments, although he indicated the fights arose because she hit J. Defendant admitted that he used to physically strike Esparza and had been twice convicted for hitting her. According to defendant, J. never saw him hit Esparza. Defendant admitted hitting J. one time and stated that the incident occurred in the Mastic house when J. stuck out his tongue at defendant after being told to do something. Defendant acknowledged he "just spanked him one time on the back."

Defendant testified that a detective who interviewed him did not read him his *Miranda* rights. Defendant recalled being asked a number of times whether he had put his penis in J.'s anus and denying it each time. However, he testified that he had acknowledged to the detective that he had grabbed his son's testicles. Defendant asserted that he never confessed to having put his penis into his son's anus.

When asked why he would believe that Esparza would tell J. to make these accusations against him, he started to answer, "Yes, because she told me that if I ever left her—" The court then sustained a hearsay objection and told the jury to disregard the testimony following "yes." When defense counsel asked defendant whether Esparza threatened to call the police on him, the court sustained a hearsay objection.

Cal. Ct. App. Opinion, pp. 2-9.

B.     <u>Procedural History</u>

5

1  Following trial by jury in Santa Clara County, Torres was convicted of four counts of aggravated sexual assault of a child under the age of 14, and one count of dissuading or attempting to dissuade a witness "by force or by an express or implied threat of force or violence." He was sentenced to 63 years in prison. The California Court of Appeal affirmed the conviction and the California Supreme Court denied review.

Torres then filed this action. In his federal habeas petition, Torres asserted the following claims: (1) the trial court's exclusion of evidence violated Torres' rights to present a defense and to due process, (2) Torres received ineffective assistance of counsel when his attorney failed to object to the prosecutor's improper argument, (3) the jury instructions violated his right to due process in that (a) the trial court erroneously failed to define force and duress in the aggravated sexual assault jury instructions, (b) the instructions regarding sodomy by force were misleading, and (c) the instruction on victim-witness corroboration was improper, (4) his right to due process and to a unanimous jury was violated by the use of CALJIC 17.41.1, and (5) his consecutive sentences are not allowed under state law.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is the proper venue because the challenged conviction occurred in Santa Clara County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

6

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the constitution or laws or treaties of the Unites States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

**DISCUSSION**

A.   Exclusion of Evidence

Torres claims that the trial court's exclusion of certain evidence denied him his constitutional rights to due process, a fair trial, and to present a defense. Torres complains that the court improperly sustained objections to evidence that purportedly showed ex-wife Esparza's state of mind: (1) evidence from Torres' sister, Maria Montenegro, that Esparza "used to say my brother was with Leticia [Ordaz]" when Torres was not at home; (2) evidence that Esparza had threatened that "something was going to happen to" Ordaz's daughter, (3) evidence that Javier had told Montenegro that his mother had hit him because he refused to telephone Ordaz, (4) evidence that Esparza told Montenegro that she had asked her brothers to find Torres and beat him up, (5) evidence that Esparza threatened to call police on Torres if he left her, (6) evidence that Esparza had used particular "curse words" against her son Javier, and (7) evidence that Javier would say he was going to go eat because Esparza would never give him food. The evidence and the trial court's rulings are discussed in the background section above-quoted. Torres argues that each statement was relevant to Esparza's state of mind and was either admissible for non-hearsay purposes or under the state of mind exception to the hearsay rule.

The California Court of Appeal rejected Torres' challenge to the trial court's rulings

7

excluding the evidence. The California Court of Appeal found that the evidentiary rulings did not amount to federal constitutional error and therefore the harmlessness of the errors was to be analyzed under a less stringent standard applicable to evidentiary errors of the non-constitutional variety. See Cal. Ct. App. Opinion, p. 12. Specifically, the court determined that the standard of People v. Watson, 46 Cal.2d 818 (1956), rather than the standard from Chapman v. California, 386 U.S. 18 (1967), governed its analysis. Watson is comparable to the standard in Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), and is less favorable to the petitioner than the Chapman standard. See Bains v. Cambra, 204 F.3d 964, 971 (2000). However, Chapman rather than Brecht is the correct standard of review on direct appeal for alleged constitutional errors. The state appellate court's rulings regarding harmlessness of the alleged evidentiary errors thus do not receive deference under § 2254(d) because that court did not apply the appropriate standard.[1]

The Due Process Clause does not guarantee the right to introduce all relevant evidence. See Montana v. Egelhoff, 518 U.S. 37, 42 (1996). A defendant does not have an unfettered right to offer evidence that is incompetent, privileged or otherwise inadmissible under standard rules of evidence. See id. The exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Id. at 43 (quoting Patterson v. New York, 432 U.S. 197, 201-02 (1977)) (internal quotations omitted). The defendant must establish that his right to have the jury consider the excluded evidence in the case was a "fundamental principle of justice." See id.; see also Chia v. Cambra, 360 F.3d 997, 1003 (9th Cir. 2004) (it is clearly established federal law under AEDPA that when hearsay statement bears persuasive assurances of trustworthiness and is critical to the defense, the exclusion of that statement may rise to the level of a due process violation). If an error is found, the court must consider whether it "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. The error must

---

[1]This does not mean that the California Court of Appeal erred, but rather that its decision on the merits of the claim -- i.e., that there was no constitutional error -- led it to apply a standard (Watson) that is not the correct standard when an error of constitutional dimension is found. In other words, if this court found that the exclusion of evidence did violate Torres' rights to due process and to present a defense, it could not then decide whether that error was harmless with deference to the state appellate court's opinion

have resulted in actual prejudice. Id.

When deciding whether the exclusion of evidence violates a criminal defendant's rights to due process and to present a defense, the court balances the following five factors: (1) the probative value of the excluded evidence on the central issue, (2) its reliability, (3) whether it is capable of evaluation by the trier of fact, (4) whether it is the sole evidence on the issue or merely cumulative, and (5) whether it constitutes a major part of the attempted defense. Chia, 360 F.3d at 1004.

Applying Chia's five part-test to the excluded evidence shows that Torres' constitutional rights were not violated. First, the probative value of the statements regarding Esparza's mistreatment and neglect of Javier were minimal because the statements were only relevant to a collateral issue of Esparza's state of mind. The excluded evidence was probative as to Esparza's credibility but not as to Javier's personal credibility and therefore was only indirectly probative on the central issue of whether Torres committed the crimes. Second, the reliability of the excluded evidence is questionable because the statements were hearsay. Third, the trier of fact would have had some difficulty evaluating the evidence because it was hearsay once or twice removed - - e.g. "she said . . . " or "he said she said . . . " - - and the declarant was not then on the stand to have his or her demeanor evaluated by the jury. Further, the witness on the stand through whom the hearsay would come in had a clear motive to help defendant's case and criticize Esparza in doing so. Fourth, Torres had already presented substantial evidence that Esparza had reason to be biased against him based upon his relationship with Ordaz, that Esparza appeared obsessed with his whereabouts when he was not at home and would try to track him down, that Esparza threatened Ordaz's daughter, and that Esparza mistreated Javier in a number of ways.[2] The excluded evidence was cumulative and far from the sole evidence presented on the issue of Esparza's state of mind. Finally, although the excluded evidence may have bolstered Torres' defense by undermining the credibility of one of the prosecution's witnesses, none of the excluded evidence went directly to

---

[2] See RT 84-85 (establishing that Esparza was often jealous of Torres' daughter), RT 135-137 (establishing that Esparza would mistreat and hit Javier), RT 207-210 (establishing that Esparza was obsessed with Torres and would go out looking for him, and would leave Javier home alone), RT 243 (establishing that Esparza made threats to Ordaz's daughter).

whether he committed the offenses. The court did not exclude any statements that Torres had not committed the crime or that Esparza or Javier had fabricated these charges. The trial court's rulings did not constitute a refusal to allow Torres to present his defense, but merely rejected certain evidence concerning the defense. The exclusion did not rise to the level of impairing Torres' due process right or right to present a defense.

Even if the exclusion of the evidence was error, it did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. Esparza's mothering skills, mistreatment of Javier, and obsession with Torres do not negate the validity of Javier's testimony. The unfortunate reality is that a child may have both a bad mother and a bad father. After extensive questioning by both the prosecution and the defense, Javier's testimony established an honest and believable portrayal of the two assaults by his father. He described in detail the location, time, and manner in which the sodomy occurred. See RT 98-116. The jury was able to observe and evaluate Javier's demeanor and the validity of his statements. The credibility of Esparza as a witness was not a determinative factor in the believability of Javier's testimony. Torres is not entitled to federal habeas relief on this claim.

B. Ineffective Assistance of Counsel Claim

Torres contends that his trial counsel rendered ineffective assistance by failing to object to the prosecutor's misstatement in closing argument that, during the second sodomy incident, Torres put his hand over his son's mouth when his son screamed. See RT 362, 364. There was no evidence that he placed his hand over Javier's mouth during the second incident.

The Sixth Amendment right to counsel guarantees not only assistance, but effective assistance, of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id. The court considers whether counsel's performance was deficient, i.e., whether it fell below an "objective standard of reasonableness" under prevailing professional norms. Id. at 687-88. The court also considers whether the petitioner was prejudiced by counsel's deficient

performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. Deference to counsel's tactical decisions in closing presentation is particularly important because of the broad range of legitimate defense strategy at the time. See Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (counsel's exclusion of some issues in closing did not amount to professional error of constitutional magnitude where issues omitted were not so clearly more persuasive than those raised); United States v. Fredman, 390 F.3d 1153, 1157-58 (9th Cir. 2004) (affirming validity of "confession and avoidance" tactic by counsel to avoid diminishing his credibility by arguing a lost cause on part of the case). "[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." Yarborough, 540 U.S. at 5-6.

Even if defense counsel believed the argument could be objected to, counsel's decision-making must be evaluated in the context of the available facts. Strickland, 466 U.S. at 690. If a defense objection were overruled, the prosecutor's statement would have been highlighted. It was a reasonable tactical choice to let the statement stand, rather than highlight it with an objection. It would not aid the defense to have the jury spending any extra time thinking about the parties' particular reactions to the sodomy. That is, defense counsel very reasonably could have decided that it was unwise to call attention to whether Torres put his hand over the boy's mouth when the boy screamed upon being penetrated. Even if the objection had been sustained, there probably would have been a brief moment of focus on whether there was a lack of evidence to support the argument and the jury would have been reminded that there was testimony that the boy screamed but there actually wasn't testimony that Torres then covered his mouth. These were crimes with ugly facts; it was very reasonable for counsel to try to keep the jury from focusing on the particulars of the crimes for the relatively minor point that there was no evidence that Torres put his hand over the screaming child's mouth.

The defense theory of the case was that the sodomies did not occur at all and that Javier was a pawn in his vindictive mother's efforts to ruin her ex-husband's life. That was an acceptable

approach for defense counsel when his client faced these difficult-to-defend charges (i.e., crimes alleged to have happened on two unspecified dates in a relatively large time frame and that occurred so many months before they were reported that the absence of physical evidence was not probative that the sodomies had not occurred). Defense counsel articulated his "Javier was a pawn" theme repeatedly in his closing argument. See, e.g., RT 388, 397, 400, 410, 412. Under the circumstances, it was not helpful to the defense to object to a part of the prosecutor's closing argument that would prompt the jury to focus on the particulars of one sodomy. Counsel's non-objection was not deficient performance and instead was consistent with his efforts to try to keep the jury focused on the big picture that the entire story was made up and that Javier was just a pawn in Esparza's game. Like the "judicious selection of arguments for summation," Yarborough, 540 U.S. at 8, deciding whether to object to an error in the prosecutor's closing argument that might detract from the chosen defense closing argument strategy is a quintessential strategy question for defense counsel as to which judicial review must be highly deferential and "doubly deferential when it is conducted through the lens of federal habeas." Id. at 8.

Furthermore, no prejudice resulted from the failure to object. The record does not establish a reasonable probability that, but for defense counsel's failure to object, the result of the proceeding would have been different. First, the court instructed the jury that "[s]tatements made by attorneys during trial are not evidence." RT 452. The court also told the jury that, "[y]ou must determine the facts from the evidence received in this trial and not from any other source." RT 451. Second, had Torres' counsel objected to the statement in question, the jury still would not have perceived Torres' threat of force differently. There had been evidence that Torres laid on top of Javier before penetrating his anus. The jury would have found the elements of force based on the evidence that the adult male forcefully pinned the child to the ground by laying on top of him so that he could not get up. RT 115. Regardless of whether or not Torres placed his hand over Javier's mouth, Torres used force by laying on top of Javier. The jury's decision would have remained the same and the outcome of the proceedings would not have differed with an objection. There is not a reasonable probability that the result of the trial would have been different had the objection been made.

The state court reasonably rejected Torres' ineffective assistance of counsel claim. The California Court of Appeal cited the controlling case, Strickland, and followed Strickland's guidance that "[t]actical errors are generally not deemed reversible, and counsel's decision making must be evaluated in the context of the available facts." Cal. Ct. App. Opinion, p. 13. The state court of appeal did not apply Strickland in an objectively unreasonable manner in determining that counsel's non-objection was not prejudicial. Accordingly, the application of Strickland was neither contrary to, nor an unreasonable application of, the clearly established federal law. Torres is not entitled to the writ on this claim.

C.   Jury Instruction Error Claims

Torres makes three jury instruction error claims. First, he claims that the court violated his right to due process when it failed to instruct the jury sua sponte on the definitions of "force" and "duress" with regard to the four aggravated assault charges. Second, he claims that the trail court violated his right to due process when it erroneously instructed the jury that it could find Torres guilty of sodomy by force if it found that Torres had committed the act regardless of whether he had threatened to retaliate. Third, he claims that his right to due process was violated by the use of CALJIC 10.60, which he contends improperly bolsters the victim's credibility.

1.   Failure To Define Force And Violence

The first question is whether the trial court's failure to sua sponte define the terms "force" and "duress" amounted to a due process violation. The claim involves the first four counts of the indictment. Counts 1 and 2 charged Torres with aggravated sexual assault by committing sodomy by force. The jury was instructed that it could not find Torres guilty of these crimes unless it found that the sodomy "was accomplished against the alleged victim's will by means of force, violence, duress, menace, or fear of immediate unlawful bodily injury on [the alleged victim] [or] [another person]." CT 186. Counts 3 and 4 charged Torres with sexual penetration by force. The jury was instructed that it could not find Torres guilty of these crimes unless it found that the sexual penetration "was against the will of the alleged victim" and "was accomplished by the use

of force, violence, duress, menace, or fear of immediate unlawful bodily injury to the alleged victim." CT 189.

The California Court of Appeal rejected Torres' claim that the trial court erred in failing to define force and duress, finding that the error, if any, was harmless. See Cal. Ct. App. Opinion, pp. 14-19. The prosecutor had identified the prosecution theory of force and violence in her closing argument. She argued that force for the sodomy and sexual penetration crimes was shown by "the evidence that defendant was lying on top of J. and J. tried to move but defendant did not let J. up or stop when J. told him to stop." Id. at 18. And to show that duress existed for the sodomy and sexual penetration crimes, "the prosecutor defined duress as 'a direct or implied threat of force, violence, danger or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which she or he in this case would not otherwise have performed or acquiesce in an act to which he would not otherwise have submitted.' She focused on J.'s age, defendant's authoritative status as J.'s father, defendant's acts of violence against J.'s mother, and evidence that J. had witnessed defendant beating his mother." Id. at 18.

The California Court of Appeal further noted that the defense theory was that none of the crimes had occurred, the whole story was contrived by Esparza who was using her son as a pawn, and that the detective lied when he said Torres confessed. The state court explained that, with this defense, the definitions of force and duress were "not material to the jury's resolution of the pivotal issue of credibility." Id. at 19. Further, once the child's testimony was accepted as credible, it established duress due to the assailant and victim's familial relationship as well as disparate sizes, even if the child's testimony was equivocal regarding the use of physical force. Id. Duress was shown by this evidence: Torres was the father of the 6-year old victim and therefore in a position of parental dominance, physically much larger than the victim, committed the crimes in the privacy of a bedroom and when the victim's mother wasn't home, and exercised physical control by laying on top of the victim; the victim was unable to get away or insist that his father stop; and the victim knew his father's capabilities because he had previously seen his father

threaten and hit his mother.[3] The court concluded that it was "clear beyond a reasonable doubt the jury would have reached the same verdict absent the alleged instructional error." Id.

A state trial court's failure to give a jury instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding. See Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution. See id. Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury. See Duckett v. Godinez, c, 745 (9th Cir. 1995), cert. denied, 517 U.S. 1158 (1996). An examination of the record is required to see precisely what instructions were given and what were refused and whether the given instructions adequately embodied the defendant's theory. See United States v. Tsinnijinnie, 601 F.2d 1035, 1040 (9th Cir. 1979), cert. denied, 445 U.S. 966 (1980). If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, see Brecht, 507 U.S. at 637, before granting relief in habeas proceedings.

The state court of appeal's rejection of Torres' claim was not contrary to, or an unreasonable application of, clearly established federal law. There is no clearly established federal right to have the court sua sponte define terms in an instruction to the jury. The instructions given, under the circumstances of this case, did not so infect the entire trial that the resulting conviction violated due process. As the state appellate court noted, the defense theory was that the whole story had been made up; the instructions on witness credibility adequately covered this theory. See CT 161-170. Any definition of force and duress would not have mattered to the success of this defense. The instructions given that listed duress and force among other ways to show the acts were against the victim's will did not mislead or confuse the jury, especially in light of the prosecutor's elaboration on these points in closing argument. Torres is not entitled to the writ on this claim.

---

[3]Although there in theory is a kind of duress – i.e., threats of a hardship – that is not properly considered under state law, there was no evidence, argument or instruction in Torres' case that the duress consisted of threats of a hardship. See id. Thus, that argument is a red herring.

15

### 2. The Sodomy By Force Instruction

Torres contends that the jury was improperly instructed on the crime of sodomy by force in that the instruction misled the jury to believe Torres could be convicted of sodomy by force based on a finding that he threatened to retaliate. There are different kinds of sodomy against the victim's will and the instruction here covered two kinds although Torres had only been charged with one kind. Specifically, Torres had been charged with aggravated sexual assault under § 269(c)(3) in that he committed sodomy by "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim," and he had <u>not</u> been charged with committing sodomy against the victim's will by "threatening to retaliate in the future," <u>see</u> Cal. Penal Code § 286(c)(3). <u>See</u> CT 64-65. The instruction given erroneously allowed conviction under § 269(c)(3) or § 286(c)(3). The jury was instructed.

> Defendant is accused in Counts 1 and 2 of having committed the crime of unlawful sodomy in violation of Section 286 of the Penal Code, sodomy by force, violence, duress, menace and fear of immediate and unlawful bodily injury. [¶] Every person who participates in an act of sodomy when the act is accomplished against the victim's will by means of force, violence, duress, menace or fear of immediate and unlawful bodily injury on the alleged victim or another person, <u>and there is a reasonable possibility that the perpetrator will execute the threat</u>, is guilty of the crime of unlawful sodomy in violation of Section 286 of the Penal Code. . . .
>
> "Against the will" means without the consent of the alleged victim.
>
> "Threatening to retaliate" means a threat to inflict extreme pain, serious bodily injury or death.
>
> In order to prove this crime, each of the following elements must be proved:
>
> One, a person participated in an act of sodomy with an alleged victim; and
>
> Two, the act was accomplished against the alleged victim's will by means, force, violence, duress, menace or fear of immediate and unlawful bodily injury on the alleged victim or another person.

RT 466-467.

The California Court of Appeal found two errors in the instruction and determined that both were harmless. Only the first error is raised in Torres' federal habeas petition.[4] The California

---

[4] The second error was that the first underlined phrase in the quoted instruction erroneously added a requirement that there be a reasonable possibility that the perpetrator would execute the threat. The California Court of Appeal noted that no relief for this error was available because the error aided rather than harmed Torres in that it added an extra requirement to prove guilt.

16

Court of Appeal explained that the error was harmless under Chapman as well as under the state law error standard because the "instructions made clear that the jury had to find that the acts of sodomy were accomplished against the alleged victim's will by means of 'force, violence, duress, menace or fear of immediate and unlawful bodily injury on [J.] or another person.'" Cal. Ct. App. Opinion, p. 23.  The court determined that it was "not reasonably likely that the jury misunderstood from the erroneous instructions that 'threats to retaliate' could substitute for force, duress, etc. as defendant suggests.  It seems most likely the phrase, 'and there is a reasonable possibility that the perpetrator will execute the threat,' would have been understood by the jury from its context as referring to any threat of force or violence by which the sodomy may have been accomplished." Id.

The California Court of Appeal's rejection of the claim was not contrary to, or an unreasonable application of, clearly established federal law.  Like the state court, this court sees no reasonable likelihood that, applying the instructions given, the jury could find sodomy by force based on a threat to retaliate.  The sentence structure in the instruction does not support Torres' interpretation of it.

Torres argues that the evidence showed that any threat to retaliate occurred after the sodomy and therefore it could not have been the way he accomplished the sodomy.  This argument is beside the point, in light of the court's determination that the jury instruction could not reasonably be interpreted to allow the threat of retaliation as a means to find sodomy by force.  Moreover, Torres had not been charged with committing sodomy against the victim's will by "threatening to retaliate in the future," see Cal. Penal Code § 286(c)(3), so there would be a different problem (i.e., conviction of an uncharged offense) than a timing problem if the jury had found him guilty based on the retaliation evidence.

3.  Witness Corroboration Instruction

Torres contends that trial court impermissibly bolstered the credibility of Javier's testimony when it instructed the jury that the sexual assault victim's testimony did not have to be corroborated by other evidence. The instruction stated, in pertinent part, that "[i]t is not essential

17

to a finding of guilt of the crimes charged in counts 1, 2, 3, or 4 that the testimony of the witness with whom sexual activity is alleged to have been committed be corroborated by other evidence." CT 191; CALJIC 10.60.

The California Court of Appeal rejected Torres' claim concerning CALJIC 10.60. The challenged instruction had to be considered in the context of the many other instructions given that touched upon the evaluation of witness testimony, and when considered in that context, the use of the instruction did not violate Torres' constitutional rights. See Cal. Ct. App. Opinion, pp. 25-26.

As the state appellate court noted, the instruction correctly stated the law, did not tell the jury to give the victim's testimony greater credibility or weight, the California Supreme Court had approved the use of the instruction in sex offense cases, id. at 26 (citing People v. Gammage, 2 Cal. 4th 693, 702 (Cal. 1992)), and "the instructions taken as a whole properly informed the jury of its fact-finding and the prosecution's burden of proof and did not favor the victim." Cal. Ct. App. Opinion, p. 26.

The jury instructions, taken as a whole, properly informed the jury of its fact-finding function and the prosecution's burden of proof and did not favor the victim. The jury was instructed in the factors a jury may consider when determining witness credibility; that jury members are the sole judges of the believability of a witness and the weight to be given the testimony of each witness; that a jury is not bound to decide an issue of fact in accordance with the testimony of a number of witnesses that does not convince it, as against the testimony or other evidence, which is more convincing; and that a defendant is presumed innocent unless his or her guilt is proven beyond a reasonable doubt.

The California Court of Appeal's decision was not contrary to or an unreasonable application of, clearly established federal law. Torres is not entitle to the writ on this claim.

D.   Jury Nullification Instruction

Torres next contends that the use of CALJIC 17.41.1 at his trial violated his rights to due process, to a unanimous jury and to benefit from the possibility of jury nullification. CALJIC 17.41.1 instructs jurors to inform the court of other jurors' misconduct and potential misconduct.

18

Torres' claim must be rejected in light of the Ninth Circuit's decision in Brewer v. Hall, 378 F.3d 952, 955-56 (9th Cir. 2004). There, the court determined that "no Supreme Court case established that an instruction such as CALJIC 17.41.1 violates an existing constitutional right." Id. at 956. Without such Supreme Court authority, relief cannot be granted under the standard in 28 U.S.C. § 2254(d).

E.   Consecutive Sentences

Torres contends that he should have received concurrent rather than consecutive sentences for his crimes because there was insufficient evidence to support the decision to impose consecutive sentences. The claim is one for the incorrect application of state law and that alone cannot support federal habeas relief. See Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994); see generally Pulley v. Harris, 465 U.S. 37, 41 ("A federal court may not issue the writ on the basis of a perceived error of state law.")

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. The clerk shall close the file.

IT IS SO ORDERED.

DATED: November _1__, 2005

_____
SUSAN ILLSTON
United States District Judge